# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### MARCH 1998 SESSION



FILED

June 12, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | |
|---|---|
| **STEPHEN MICHAEL WEST,** | ) |
| | ) C.C.A. No. 03C01-9708-CR-00321 |
| Appellant, | ) |
| | ) Union County |
| V. | ) |
| | ) Honorable John K. Byers, Senior Judge, |
| | ) Sitting by Designation |
| **STATE OF TENNESSEE,** | ) |
| | ) (Post-Conviction - Death Penalty) |
| Appellee. | ) |

FOR THE APPELLANT:

Roger W. Dickson
Leah M. Gerbitz
Miller & Martin
1000 Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402

John T. Milburn Rogers
Rogers, Laughlin, Nunnally,
Hood & Crum
100 South Main Street
Greeneville, TN 37743

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Glenn R. Pruden
John P. Cauley
Assistant Attorneys General
425 Fifth Avenue North
Nashville, TN 37243-0493

William Paul Phillips
District Attorney General

Clifton H. Sexton
Assistant District Attorney General
P.O. Box 10
Huntsville, TN 37756-0010

OPINION FILED: _____

**AFFIRMED**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

The petitioner was convicted of two counts of first degree premeditated murder, one count of aggravated rape, and two counts of aggravated kidnapping. He was sentenced to death. His convictions and sentences were affirmed by the Tennessee Supreme Court. State v. West, 767 S.W.2d 387 (Tenn. 1989). These brutal murders were committed by the petitioner and another individual, Ronnie Martin, whose case was severed. At the petitioner's trial, his defense was that he was forced by Martin to engage in the crimes and could not get away from Martin although the appellant was bigger and taller than Martin and was Martin's supervisor at a fast-food restaurant. The motive of the crimes was sex and money. The petitioner gave varying accounts of what had happened and blamed Martin for the crimes. The petitioner was represented at trial by two lawyers, Mr. McConnell and Mr. McAlexander.

In 1990, the petitioner filed a post-conviction relief petition alleging ineffective assistance of counsel, prosecutorial misconduct and trial court errors, and challenging the constitutionality of the Tennessee death penalty statute. Judge John K. Byers, Senior Judge, held hearings in September and October 1996 on the petition. In April 1997, the hearing court entered comprehensive findings of fact and conclusions of law in denying relief requested in the petition. Following the appropriate appellate procedures, petitioner appealed to this Court. We heard oral arguments on March 24, 1998.

The issues for review can best be summarized as follows:

       I. Should the petitioner's death sentence
      be vacated because he was denied effective

assistance of counsel at the sentencing
hearing?

II. Should the petitioner's case be remanded
for a new sentencing hearing because the
evidence does not support the aggravating
circumstance that the petitioner's actions were
committed to avoid arrest or prosecution?

III. Should the petitioner's convictions be set
aside because the trial judge did not charge
applicable lesser offenses?

IV. Did the post-conviction relief trial court err
regarding petitioner's motion for defense services?

We affirm the judgment of the post-conviction court which denied relief.

## THE EVIDENTIARY HEARING

Dr. Eric Engum, a clinical psychologist, conducted a two-hour evaluation
of the petitioner in December 1995. Dr. Engum testified that his tests did not
indicate any sign of brain damage or any type of "cognitive compromise."
Petitioner's intelligence was within normal limits. The petitioner suffers from
depression and mixed personality disorder, both of which are of a long-standing
nature. Dr. Engum stated that the petitioner was "somewhat unstable, moody,
and changeable." He had a poor home life and home environment.

The psychologist testified that the results of the Minnesota Multi-Phase
Personality Inventory indicated that the petitioner had a lot of anger resulting
from earlier childhood experiences. Dr. Engum's opinion was that the petitioner
could be submissive and was functioning at an emotional level less than his
chronological age. Dr. Engum opined that the test results would have supported
the thrust of the defense of the petitioner at the guilt phase of the trial, that the
codefendant dominated and controlled the petitioner "who was acting under a

-3-

form of duress." Dr. Engum concluded that the petitioner suffers from a condition characterized as extreme emotional disturbance.

Dr. Engum compared his findings to that of Dr. Bursten, a psychiatrist who had been used during the initial trial of the petitioner. Dr. Engum described how the petitioner had told Dr. Bursten that during the incident he could not do anything about the crimes perpetrated upon the victims. Dr. Engum then stated that Dr. Bursten had been employed during the initial trial to conduct a sanity and competency evaluation, which was different from the neurological assessment that he had conducted.

On cross-examination, Dr. Engum admitted that in the twenty cases in which he had testified as an expert, he had testified for the defense. Dr. Engum stated that the petitioner had told him that he had no recollection of any events in his life before the age of ten. The doctor admitted that the petitioner had been asked by Dr. Bursten if he had ever encountered any abuse, and the response had been "No."

Debbie West, sister of the petitioner, testified that she was the oldest of four siblings. She stated that the petitioner's mother had had an affair in 1961 and that the petitioner had been born in a mental institution in 1962. Ms. West testified that in 1964 the petitioner had "been knocked cross-eyed" by being thrown against the wall of the family home. She testified that the petitioner also had been slapped in the head and hit with shoes. She said that the petitioner had been abused throughout his childhood.

Ms. West testified that her father has been an alcoholic since he was ten years old and that he is a violent man. She stated that the petitioner would flinch

when either his mother or his father came toward him.  She then stated that she had not spoken with the petitioner in ten years.

When questioned about her participation in the sentencing phase of her brother's trial, Ms. West stated that she had told Mr. McConnell, trial counsel, about the abuse suffered by the petitioner.  Mr. McConnell told her that this information was not relevant because the petitioner's parents were paying his fee.  Therefore, they would not admit to anything.  She stated that she would have testified concerning the abuse if she had been asked about it when she took the witness stand.

On cross-examination, Ms. West admitted that when she was questioned during the sentencing phase of the trial as to whether there was ever any problem between the petitioner and the rest of the family as far as discipline, she had replied, "No."  She admitted that at the sentencing hearing she had testified that the petitioner had lived with her and that he had never been involved in any trouble but that in actuality, the petitioner had experienced a problem with drugs and alcohol.  She stated that she had not informed the court of his problems or information concerning abuse at the sentencing phase because she was not asked specific questions.  Also, her mother was on the verge of a heart attack at the initial trial, and she did not think it would benefit the petitioner to tell things that would harm her mother.

The next witness, Mr. McAlexander, co-counsel in the petitioner's trial, was called, out of order, to testify for the state.  Mr. McAlexander testified that he had been licensed to practice law in 1986 and that he had been contacted by Mr. McConnell, chief counsel in the petitioner's trial, to assist him in the case.  He initially reviewed files and conducted investigations.  He had done a tremendous amount of research in preparing motions filed by the petitioner.  He had met with

the petitioner's family on numerous occasions during the pendency of the trial and he had participated in everything that occurred in the case after he was appointed co-counsel. He stated that he had handled the motion for new trial, the appeal, and the suppression motion in the case by himself. His total time spent was 547.4 hours.

Mr. McAlexander testified that he did not remember Ms. West, the petitioner's sister, ever alleging that the petitioner had been abused during childhood. He also could not recall that the petitioner ever alleged any type of abuse. He stated that he had not received as much cooperation from the petitioner's family as he would have liked.

On cross-examination, Mr. McAlexander testified that he had no experience as a trial lawyer in defending capital cases. He admitted that he knew Mr. McConnell, like himself, had never had any experience trying a capital case. He recalled that Mr. McConnell had experienced difficulty with his fee because he had been retained and that he had made the statement that Mr. McAlexander, a court-appointed attorney, was getting paid more than he was getting paid as a retained lawyer.

Mr. McAlexander admitted that Mr. McConnell had consulted Dr. Ben Bursten regarding a sanity and competency evaluation. As a result of the evaluation, the petitioner had attempted to introduce a duress defense through expert witness testimony. The trial court rejected the request for expert services because Mr. McConnell had earlier objected to a court-ordered evaluation of the petitioner at Middle Tennessee Mental Health Institute. Mr. McAlexander also testified that a suppression hearing concerning inconsistent statements by the petitioner had been conducted and that he had requested that the hearings be

transcribed.  However, at the time of the trial, the hearings had not been transcribed.

On redirect examination, Mr. McAlexander recalled that the issue concerning hiring a defense expert on the duress defense was raised on appeal, and the Supreme Court ruled that this testimony would not be admissible anyway.  The Supreme Court also compared the transcript of the suppression hearing with that of the trial transcript and concluded that there were no overlooked opportunities for impeachment.

Mr. McConnell, chief counsel for the petitioner, was called by the petitioner to testify.  He had been paid $10,000 by the petitioner's family for his representation.  In addition, several thousand dollars were paid by the family to investigators and Dr. Bursten.  He admitted that when he learned that his co-counsel was paid $20,000, he had not been happy.  He also admitted that at the time of the trial, he had never handled a capital case involving the death penalty.  He admitted that he had requested additional funds from the petitioner on numerous occasions but that he had not been paid these funds.

Mr. McConnell claimed that he had made a complete investigation into the petitioner's life.  Records were introduced into evidence to show that Mr. McConnell had waited to subpoena the school records of the petitioner until the second day of the trial.  Counsel admitted having no recollection of obtaining any employment records, birth records, medical records, or military records of the petitioner.  He further admitted that he "wouldn't have wasted any time" on conducting interviews of siblings for the purpose of exploring mitigation themes because the petitioner had never raised those issues.

Mr. McConnell recalled that Dr. Bursten had been employed to conduct a sanity and competency evaluation. Mr. McConnell admitted that he had filed a motion in opposition to a court-ordered competency evaluation. After the state's motion was denied, Mr. McAlexander filed a motion to obtain expert services for a "duress defense." This motion was denied.

Mr. McConnell admitted that he had been allowed to withdraw from this case while the motion for a new trial was pending. His co-counsel was going to handle the appeal, and Mr. McConnell's practice had suffered economically as a result of this case. He further testified that his theory at the guilt phase of the trial had been that although the petitioner was at the scene of the murders, his codefendant had actually committed the murders. At the penalty phase, counsel had attempted to show that the petitioner was a veteran, that it would be an extreme hardship on his wife and new baby without him, and that the petitioner was a young man with no prior record. Mr. McConnell stated that he had attempted to appeal to the common sense, decency, and sympathy of the jury.

On cross-examination, personal diaries Mr. McConnell kept during his representation of the petitioner were entered into evidence. Mr. McConnell recalled interviewing family members of the petitioner, especially the petitioner's mother and one of his sisters, Deborah Adams. He testified that at no time during his interviews with Ms. Adams did she make him aware of any abuse suffered by the petitioner in his early years. He testified that the family had told him that the petitioner had come from a happy family.

Mr. McConnell testified that he had employed two private investigators to check out whether the petitioner's codefendant had been involved in a cult. One of the investigators had also attempted to measure the prejudice in the community against the two alleged perpetrators of the crime.

On redirect examination, Mr. McConnell was questioned concerning a press interview he had given about the case in his initial representation during which he had mentioned that a satanic cult might be involved. He responded that he had intended to show that it was the petitioner's codefendant who might have had an involvement with a cult.

Mr. Jerry Summers, a seasoned Tennessee attorney who has participated in many criminal trials, capital and noncapital, testified that he had been asked by post-conviction counsel to review the record in this case. Upon his review, Mr. Summers' opinion was that counsel's performance in this case fell below the range of competence required of attorneys in death penalty cases. Specifically, he stated that Ms. West's testimony that the petitioner was born in a mental institution would have been a red flag. He stated that he would certainly have talked to others besides family members in determining a defendant's background. Family members might not always be truthful because of embarrassment or shame.

Mr. Summers' opinion was that the standards for defending a death penalty case would require counsel to obtain a psychological evaluation other than a sanity and competency evaluation, especially considering the facts of this case. He opined that Dr. Engum's report would have been extremely valuable at the sentencing phase of the trial because it indicated that the petitioner suffered from specific emotional problems. The report would have supported certain mitigating factors such as: that the murders were committed while the defendant was under the influence of extreme mental or emotional disturbance, that his participation in the murders was relatively minor, and that the defendant acted under extreme duress and under the substantial domination of another.

Mr. Summers testified that the petitioner's failure to remember anything concerning events in his life before the age of twelve or thirteen should have been an indicator that he was attempting to block out certain events from that time period. Mr. Summers would not have waived jury instructions on lesser included offenses, as counsel did, because jurors might want to help someone if they think that person was less culpable than someone else. In conclusion, Mr. Summers testified that it was his opinion that the attorneys' performance fell below the range of competence required of capital case attorneys in that they did not conduct a proper investigation, did not conduct thorough interviews, and did not get a psychological evaluation.

On cross-examination, Mr. Summers admitted that a lawyer could make a strategic decision not to have a psychologist examine the defendant if he had previously been examined by a psychiatrist. However, he further opined that the red flags in this case would have led counsel to further investigation rather than accepting the petitioner's and the family's word.

Patricia Depew, another sister of the petitioner, testified that she had grown up in the same house with the petitioner as a child. She recalled physical and verbal abuse of herself and the petitioner. She testified that the petitioner had reacted to the abuse by becoming passive. When questioned about whether she had ever spoken with petitioner's trial counsel, she stated that she had just spoken with her mother about the case. She recalled that she had attended some of the meetings between her mother and counsel but that counsel had never asked her any questions. When asked why she had not told the attorneys about the abuse, she stated that nobody had asked and she had not thought that it was important. On cross-examination, Ms. Depew stated that she had been in New Mexico the five years before the petitioner's arrest.

Ruby West, the petitioner's aunt, testified that she had lived upstairs from the petitioner's apartment when he was a child. She said that petitioner's parents were abusive. The petitioner's mother would swear at him, beat him, and would put him in a cold room with a mattress wet with urine. She recalled one occasion when the petitioner's mother got angry at him and threw him against the wall by his feet. She recalled several incidents of abuse. She also stated that the petitioner's father had participated in some of the abuse. She then stated that she had never been contacted by petitioner's counsel at the time of his trial.

On cross-examination, Ms. West testified that she had been contacted by her husband, brother of the petitioner's father, and asked if she would testify as to the abuse the petitioner had experienced as a child. She stated that at that time she was living in Ohio but had since moved back to Tennessee. The petitioner's brother had approached her and asked if she would be willing to testify as to the abuse. She told him that she would rather not get involved; but when Patty, the petitioner's sister, came to see her, she told her what she remembered.

Ms. West testified that the petitioner had reacted to the abuse by becoming very timid and frightened when he saw his parents coming. She stated that he always appeared undernourished.

When she was confronted with the statement that the petitioner had made at trial that he had a close relationship with his family and that they "all still love[d] each other a lot," she stated that maybe things had changed. She stated that she had been away and that she had only been around the family closely when the petitioner was small.

The petitioner's next witness was Paul Morrow, an attorney who has been actively involved in capital case litigation since 1989 when he was employed with the Capital Case Resource Center of Tennessee. Mr. Morrow testified that there are standards by which capital cases are governed and that they are contained in the United States Supreme Court opinions. He elaborated concerning the differences in capital case representation and explained that specialized training is definitely required before accepting the representation of defendants charged with capital offenses. One of the primary differences in death penalty litigation is that an individualized sentencing hearing must be held which requires a second trial. An attorney must present to a jury the background of the defendant, the defendant's character, and anything that might permit the jury to render a sentence less than death. Mr. Morrow stated that the investigation should entail searching and pulling birth records, school records, medical records, military records, and institutional records and that from these records the attorney should be able to "ferret out" someone who could talk about the development of the defendant. Additionally, he stated that extensive interviews needed to be conducted, starting with the defendant. He added that if abuse is a factor, however, usually the defendant is the worst person to talk to because he or she is usually embarrassed or does not understand its significance.

When questioned as to the experience of counsel in this particular case, Mr. Morrow testified that Mr. McAlexander was a new lawyer and that Mr. McConnell had come from a state that did not have the death penalty, so counsel should have at least contacted other attorneys who had represented persons charged with capital offenses. They should have consulted materials that were readily available, such as the Capital Death Penalty Manual created by the Tennessee Association of Criminal Defense Lawyers. Mr. Morrow then stated that counsel's investigation in this case did not fall within the range of competence demanded of attorneys in death penalty cases.

-12-

Mr. Morrow also stated that counsel was deficient in not requesting a psychological evaluation, at least for mitigation purposes. He emphasized the importance of Dr. Engum's psychological report which would have led him to investigate the development of childhood abuse. He differed in Mr. Summers' conclusion that counsel was most deficient in the sentencing phase because it was his opinion that the psychological evaluation would have been extremely important in the guilt phase of the trial as to intent and diminished capacity. In conclusion, he testified that the prejudice that was shown in this case was that the jury did not hear the "psychological or lay witnesses that would have made somewhat comprehensible his actions on that day [day of the murders]." On cross-examination, when questioned as to the heinous nature of the crimes and as to whether any mitigation would have made a difference, Mr. Morrow stated that mitigation absolutely demands an explanation because a competent attorney must give the jury at least something.

The petitioner concluded his proof, and then Dr. Ben Bursten testified for the state. He was allowed to testify as an expert witness. He had examined the petitioner and conducted a forensic evaluation requested by counsel. Dr. Bursten stated that he had determined that the petitioner was competent to stand trial and that he could not support an insanity defense. He testified that during the evaluation the petitioner had definitely stated that there had been no childhood abuse in his family life. He admitted that he had not questioned the immediate family about abuse because they had told him that he was the most lovable of all the children. He stated that he had evaluated Dr. Engum's report and that he disagreed that the evaluations conducted indicated any type of abuse. He also testified that he disagreed with Dr. Engum that the effect of the abuse caused extreme emotional disturbance. In conclusion, Dr. Bursten stated that within a reasonable degree of medical certainty, he would not agree with Dr. Engum's assessment.

On cross-examination, Dr. Bursten testified that he was being paid by the state for his testimony as an expert witness. He admitted that he had had no contact with the petitioner since 1986. He admitted that he had contacted Mr. McConnell to obtain his permission to speak with the district attorney general.

## I.

The petitioner cites numerous cases for the contention that one of counsel's primary duties is to investigate and pursue the angles of defense, whether representing the client at trial, at sentencing, or on appeal. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989); Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975); Cooper v. State, 847 S.W.2d 521, 527 (Tenn. Crim. App. 1992). The petitioner asserts that this investigation is especially essential at the sentencing phase of a capital trial. Cooper, 847 S.W.2d at 531. However, the petitioner also acknowledges that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. 668, 689 (1984).

The petitioner contends that defense counsel's failure to investigate the petitioner's background fell far outside the range of competent assistance because the only mitigation proof was the testimony of six character witnesses that the petitioner was a well-behaved and generally liked person. The petitioner contends that his attorneys were deficient in failing to conduct any investigation into his background, educational and emotional condition, and family relationships in order to present mitigation. The petitioner emphasizes that counsel did not conduct a records search.

The petitioner faults counsel for conducting interviews of only his parents and one sister. None were questioned concerning possible abuse. The petitioner cites specific instances of abuse as reflected in the post-conviction hearing transcript. The petitioner also faults counsel for failing to have a comprehensive psychological examination. He argues that the choice not to put on evidence at the sentencing phase of the hearing cannot be defended as trial strategy because the record indicates that counsel completely failed to conduct a thorough investigation.

The petitioner cites Goad v. State, 938 S.W.2d 363 (Tenn. 1996) and Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1994) as two Tennessee cases which demanded resentencing due to counsel's failure to conduct an adequate investigation into the petitioner's life. The petitioner then recounted the testimony of Mr. Summers and Mr. Morrow.

The state cites Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993) for the following proposition:

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

The state argues that the petitioner has failed to meet his burden of proof as to counsel's ineffectiveness at the sentencing hearing. The state contends that counsel obtained the petitioner's military records and made a deliberate decision not to introduce such evidence because it contained information showing that the petitioner had a background of drug and alcohol abuse. The state argues that counsel's failure to obtain school records was not per se

-15-

ineffective because prejudice was not shown by the petitioner. The state argues that counsel's failure to obtain medical records was not per se ineffective because the petitioner did not produce such records at the post-conviction hearing which could have been introduced at trial.

Regarding the lack of a comprehensive psychological evaluation, the state argues that the testimony of Dr. Bursten was of crucial importance in this case. Dr. Bursten disagreed with expert witness Dr. Engum in that Dr. Bursten would not agree that the petitioner was an abused child. When asked to assume that the petitioner had been abused, Dr. Bursten disagreed with Dr. Engum's conclusion that the abuse would cause extreme emotional disturbance. The state argues that counsel was not ineffective for failing to uncover nonpsychological evidence of abuse because counsel had never been made aware of such abuse during interviews with the family.

We agree with the post-conviction court's assessment that "there existed conflicting testimony regarding mitigation evidence that trial counsel failed to present." We also agree with the court that Dr. Engum's testimony reflected that the petitioner's evaluation showed no signs of trauma or organic brain damage. We agree with the post-conviction court that in light of this conflicting evidence, the petitioner did not meet his burden with respect to the allegation of ineffective counsel at the sentencing phase. Regarding all of the ancillary and subissues, after a thorough review, we conclude that the petitioner has failed to meet his burden of proof as to these allegations. We agree with the post-conviction hearing court that the petitioner has failed to show how he was prejudiced by any acts or omissions of counsel.

**II.**

-16-

The petitioner asserts that during the sentencing phase of his trial, the state failed to "submit even a single piece of evidence from which any rational trier of fact could infer that the petitioner acted in order to avoid prosecution." The petitioner asserts that the post-conviction trial court failed to address this issue in its Memorandum of Law. Petitioner argues that this issue is not waived because "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b).

The state asserts that this claim has been waived by the petitioner's failure to present it at trial and during the direct appeal. See Tenn. Code Ann. § 40-30-112(b) (repealed 1995). The state argues that the petitioner's attempt to introduce the plain error doctrine into a post-conviction proceeding such as this has been specifically rejected by this Court. See State v. Sandy Eugene Womack, No. 01C01-9003-CC-00077 (Tenn. Crim. App. at Nashville, July 26, 1990).

The state also argues that the evidence adduced at the trial clearly supported this aggravating factor because it was established that the petitioner's codefendant was known to one of the victims. The petitioner and his codefendant were in the victim's home for a substantial period of time, the codefendant was wearing a restaurant uniform that would identify him, and a concerted effort had been made by the petitioner and the codefendant to wipe fingerprints from the weapons that had been handled.

We agree with the state's position on waiver. The claims advanced by the petitioner could have been raised on direct appeal but were not. The petitioner

has fostered no basis for overcoming the waiver provision found in the applicable post-conviction statute.  Therefore, this issue is without merit.

## III.

The petitioner argues that because the issues in this case revolved around his level of involvement in the murders, a second degree murder charge was indispensable.  He asserts that the trial court was required by law to instruct the jury on the lesser included offenses of first degree murder, regardless of whether he was requested to do so or not.  See State v. Ruane, 912 S.W.2d 766, 782 (Tenn. Crim. App. 1995).  The petitioner also asserts that trial counsel was ineffective for verbally waiving an instruction for second degree murder, especially since the record did not reflect that the petitioner himself voluntarily and knowingly waived the right to such an instruction.  The petitioner argues that this issue should have been raised at the motion for new trial or on appeal.  Again, the petitioner cites Rule 52(b) of the Tennessee Rules of Criminal Procedure in support of his nonwaiver claim.

The state argues that the decision to forgo instruction on lesser included offenses was a strategic decision of counsel and did not constitute ineffectiveness.  The state cites the trial record whereby counsel informed the court that it was the defendant's position that he did not wish the court to consider any lesser included offenses in his charge.  At the post-conviction hearing, the petitioner failed to examine his attorneys concerning their decision to forgo instruction on lesser included offenses.  The state asserts that the petitioner's decision to relinquish further instruction on lesser included offenses was made in light of the evidence at trial and the defense theory that the petitioner did not commit the murders.

The allegation regarding lesser included offenses is presented for the first time at the post-conviction stage. A complaint about failure to charge a lesser included offense is not a cognizable claim on post-conviction review. Only constitutional errors can be grounds for relief, and normally the failure to charge a certain offense does not violate the constitution. Moreover, the petitioner has failed to rebut the presumption of waiver, and this issue is waived. See Tenn. Code Ann. § 40-30-112 (repealed 1995). Based upon this overall record and the petitioner's theory of defense at trial, we also are of the opinion that, substantively, the issue is without merit.

## IV.

The petitioner contends that the post-conviction trial court erred in denying funds for investigative services. He faults the post-conviction court for granting a hearing on the motion for expert services and ordering the petitioner to provide the state a copy of his ex parte motion. In addition, the petitioner faults the court for allowing the state to participate in the hearing. The petitioner cites Owens v. State, 908 S.W.2d 923, 924 (Tenn. 1995) for the proposition that post-conviction petitioners are entitled to an ex parte hearing on a motion for defense services as long as procedural requirements are met.

The state contends that the trial court did not err in denying the investigative services of Mr. Ronald Lax and Ms. Gloria Shettles at a cost not to exceed $27,500 and neuropsychological services of Dr. Eric Engum in an amount not to exceed $5,000. The state asserts that the trial court did, in fact, grant an ex parte motion in part by ordering payment to Dr. Engum in the amount of $1,200. When the petitioner's post-conviction counsel filed a motion to rehear, the trial court held a hearing at which time it concluded that the amount of $1,200 payment to Dr. Engum (although the amount was later increased) was

sufficient and otherwise denied the petition to rehear. The petitioner then filed an application for permission to appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure challenging the trial court's refusal to grant funds for investigative services. The state contends that the petitioner has waived any other claims concerning an ex parte hearing. The Rule 10 application was denied by this Court.

The state cites Owens for the proposition that its holding should not be interpreted as a "blank check" requiring courts to hold ex parte hearings and to authorize funds in every case. The state contends that the affidavits of Ms. Shettles and Mr. Lax failed to demonstrate that professional investigative services were required in this case.

In Owens, the Supreme Court examined its cases in the direct appeal context and found the principles regarding investigative funds to be the same. The Court found that in State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992), a defendant has to show that a substantial need exists requiring the assistance of state-paid support services and that a defendant's defense cannot be fully developed without such assistance. The petitioner's motion and affidavits failed to explain why the investigative work could not have been done by the attorneys and must have been done by the investigators. The petitioner has not shown why these professional investigative services are required. It should be pointed out that once an individual has gone beyond the trial and direct appeal level in a case, the state does not have to write a blank check for investigative services. Just because a particular service might be of some benefit does not mean that it is constitutionally required. We agree that Judge Byers was correct in his refusal to grant the additional expert services in this post-conviction case. Furthermore, we find no prejudice regarding the allegations of the state's participation in the ex parte hearing. The petitioner simply has not carried his burden to show how the

post-conviction hearing judge committed reversible error.  This issue is without merit.

## CONCLUSION

-21-

After reviewing the record, briefs, and arguments, this Court concludes that the decision by the post-conviction judge denying post-conviction relief should be, and is, affirmed.  The petitioner's death sentence will be carried out unless stayed by competent authority.  The petitioner's execution date is set for October 1, 1998.

_____
PAUL G. SUMMERS, Judge

CONCUR:

_____
JOHN H. PEAY, Judge

_____
CORNELIA A. CLARK, Special Judge